AF Approval _Blw for Jc_              Chief Approval __RBH__

2022 OCT 12  PM 2:51
US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA
FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                    CASE NO. 6:21-cr-138-ACC-EJK

KEITH INGERSOLL

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Roger B. Handberg, United States Attorney for the Middle District of Florida,

and the defendant, KEITH INGERSOLL, and the attorney for the defendant,

Damon A. Chase, Esq., mutually agree as follows:

**A.**   **Particularized Terms**

    1.   Counts Pleading To

The defendant shall enter a plea of guilty to Counts One, Two,

Three, Four, and Five of the Superseding Information. Count One charges the

defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C.

§ 1349. Count Two charges the defendant with Wire Fraud, in violation of 18

U.S.C. § 1343. Count Three charges the defendant with Aggravated Identity

Theft, in violation of 18 U.S.C. § 1028A(a)(1). Count Four charges the

defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C.

Defendant's Initials ___

§ 1349. Count Five charges the defendant with Attempted Wire Fraud, in violation of 18 U.S.C. § 1349.

    2.    <u>Maximum Penalties</u>

Counts One, Two, Four, and Five each carries a maximum sentence of 20 years' imprisonment, a maximum fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100.

Count Three carries a mandatory sentence of two years' imprisonment to be served consecutively to any term of imprisonment for any other count, a maximum fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than one year, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

Defendant's Initials _____   2

3.    Elements of the Offenses

The defendant acknowledges understanding the nature and

elements of the offenses with which defendant has been charged and to which

defendant is pleading guilty. The elements of Counts One and Four are:

| | |
|---|---|
| First: | Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the Information; and |
| Second: | The Defendant knew the unlawful purpose of the plan and willfully joined in it. |

The elements of Count Two are:

| | |
|---|---|
| First: | The Defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises; |
| Second: | The false pretenses, representations, or promises were about a material fact; |
| Third: | The Defendant acted with the intent to defraud; and |
| Fourth: | The Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme. |

The elements of Count Three are:

| | |
|---|---|
| First: | The Defendant knowingly transferred, possessed, or used another person's means of identification; |
| Second: | Without lawful authority; |

Defendant's Initials _____      3

> Third:       During and in relation to a violation of 18 U.S.C. §
>              1349, as charged in Count One of the Information.

The elements of Count Five are:

> First:       The Defendant knowingly intended to commit the
>              crime of wire fraud, in violation of 18 U.S.C. §
>              1343; and

> Second:      The Defendant's intent was strongly corroborated
>              by his taking a substantial step toward committing
>              the crime.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of

indictment before a federal grand jury.

5.    Counts Dismissed

At the time of sentencing, all of the charges against the defendant

in the original Indictment at Doc. 1 will be dismissed pursuant to Fed. R.

Crim. P. 11(c)(1)(A).

6.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's

Office for the Middle District of Florida agrees not to charge defendant with

committing any other federal criminal offenses known to the United States

Attorney's Office at the time of the execution of this agreement, related to the

conduct giving rise to this agreement.

Defendant's Initials _____   4

7.     Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to L.W., the U.S. Small Business Administration, and the local government agency referenced in the Factual Basis below.[1]

8.     Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

9.     Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the

---

[1] The Defendant agrees that this restitution includes consultancy fees paid to the Defendant by the local government agency.

Defendant's Initials _____   5

defendant receive a two-level downward adjustment for acceptance of

responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that

this recommendation or request is not binding on the Court, and if not

accepted by the Court, the defendant will not be allowed to withdraw from the

plea.

Further, at the time of sentencing, if the defendant's offense level

prior to operation of subsection (a) is level 16 or greater, and if the defendant

complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea

Agreement, including but not limited to, the timely submission of the financial

affidavit referenced in Paragraph B.5., the United States agrees to file a motion

pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional

level. The defendant understands that the determination as to whether the

defendant has qualified for a downward adjustment of a third level for

acceptance of responsibility rests solely with the United States Attorney for the

Middle District of Florida, and the defendant agrees that the defendant cannot

and will not challenge that determination, whether by appeal, collateral attack,

or otherwise.

10.   <u>Cooperation - Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the

investigation and prosecution of other persons, and to testify, subject to a

Defendant's Initials _____   6

prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been

Defendant's Initials _____      7

provided or what type of motion related thereto will be filed, if any, rests

solely with the United States Attorney for the Middle District of Florida, and

the defendant agrees that defendant cannot and will not challenge that

determination, whether by appeal, collateral attack, or otherwise.

11.   Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no

self-incriminating information which the defendant may provide during the

course of defendant's cooperation and pursuant to this agreement shall be used

in determining the applicable sentencing guideline range, subject to the

restrictions and limitations set forth in USSG §1B1.8(b).

12.   Cooperation - Responsibilities of Parties

a.   The government will make known to the Court and other

relevant authorities the nature and extent of defendant's cooperation and any

other mitigating circumstances indicative of the defendant's rehabilitative

intent by assuming the fundamental civic duty of reporting crime.  However,

the defendant understands that the government can make no representation

that the Court will impose a lesser sentence solely on account of, or in

consideration of, such cooperation.

b.   It is understood that should the defendant knowingly

provide incomplete or untruthful testimony, statements, or information

Defendant's Initials _____   8

pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1) The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2) The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does

Defendant's Initials _____ 9

hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts

Defendant's Initials _____     10

to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

      13.   <u>Forfeiture of Assets</u>

      The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $9,814,993.36 in proceeds the defendant admits he obtained, as the result of the commission of the Conspiracies to Commit Wire Fraud charged in Count One ($9,602,200) and Count Four ($212,793.36) of the Indictment, to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the

Defendant's Initials _____ 11

result of the offenses of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging

Defendant's Initials _____ 12

instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be

Defendant's Initials _____ 13

polygraphed on the issue of assets, if it is deemed necessary by the United

States. The defendant agrees that Federal Rule of Criminal Procedure 11 and

USSG § 1B1.8 will not protect from forfeiture assets disclosed by the

defendant as part of the defendant's cooperation.

      The defendant agrees to take all steps necessary to assist the

government in obtaining clear title to any substitute assets before the

defendant's sentencing. In addition to providing full and complete information

about substitute assets, these steps include, but are not limited to, the

surrender of title, the signing of a consent decree of forfeiture, and signing of

any other documents necessary to effectuate such transfers.

      Forfeiture of the defendant's assets shall not be treated as

satisfaction of any fine, restitution, cost of imprisonment, or any other penalty

the Court may impose upon the defendant in addition to forfeiture.

      The defendant agrees that, in the event the Court determines that

the defendant has breached this section of the Plea Agreement, the defendant

may be found ineligible for a reduction in the Guidelines calculation for

acceptance of responsibility and substantial assistance, and may be eligible for

an obstruction of justice enhancement.

      The defendant agrees that the forfeiture provisions of this plea

agreement are intended to, and will, survive the defendant, notwithstanding

Defendant's Initials _____  14

the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.**    **Standard Terms and Conditions**

    1.    Restitution, Special Assessment and Fine

        The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims

Defendant's Initials _____    15

Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $500, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

    2.    <u>Supervised Release</u>

The defendant understands that the offenses to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

    3.    <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials _____    16

4.      Sentencing Information

The United States reserves its right and obligation to report to the

Court and the United States Probation Office all information concerning the

background, character, and conduct of the defendant, to provide relevant

factual information, including the totality of the defendant's criminal activities,

if any, not limited to the counts to which defendant pleads, to respond to

comments made by the defendant or defendant's counsel, and to correct any

misstatements or inaccuracies. The United States further reserves its right to

make any recommendations it deems appropriate regarding the disposition of

this case, subject to any limitations set forth herein, if any.

5.      Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P.

32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United

States Attorney's Office within 30 days of execution of this agreement an

affidavit reflecting the defendant's financial condition. The defendant promises

that his financial statement and disclosures will be complete, accurate and

truthful and will include all assets in which he has any interest or over which

the defendant exercises control, directly or indirectly, including those held by

a spouse, dependent, nominee or other third party. The defendant further

agrees to execute any documents requested by the United States needed to

Defendant's Initials _____      17

obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

     6.    <u>Sentencing Recommendations</u>

       It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States

Defendant's Initials _____    18

Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.     <u>Defendant's Waiver of Right to Appeal the Sentence</u>

          The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to

Defendant's Initials             19

appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

      8.     <u>Middle District of Florida Agreement</u>

      It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

      9.     <u>Filing of Agreement</u>

      This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

      10.     <u>Voluntariness</u>

      The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges

Defendant's Initials _____  20

defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

Defendant's Initials _____     21

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____    22

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this __11__ day of __October__, 2022

_____
KEITH INGERSOLL
Defendant

ROGER B. HANDBERG
United States Attorney

_____
Amanda Daniels
Assistant United States Attorney

_____
Damon A. Chase, Esquire
Attorney for Defendant

_____
Chauncey Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division

_____ for RBH
Roger B. Handberg
United States Attorney

Defendant's Initials _____        23

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:21-cr-138-ACC-EJK

KEITH INGERSOLL

PERSONALIZATION OF ELEMENTS

Regarding Count One:

First:   Did you and one or more persons, in some way or
manner, agree to try to accomplish a common and
unlawful plan to commit wire fraud against victim
L.W., as charged in the Information?

Second:  Did you know the unlawful purpose of the plan and
willfully join in it?

Regarding Count Two:

First:   Did you knowingly devise or participate in a
scheme to defraud victim L.W., and to obtain
money or property by using false pretenses,
representations, or promises?

Second:  Were the false pretenses, representations, or
promises about a material fact?

Third:   Did you act with the intent to defraud?

Fourth:  Did you transmit or cause to be transmitted by wire
some communication in interstate commerce to
help carry out the scheme?

Defendant's Initials _____   24

Regarding Count Three:

    First:      Did you knowingly transfer, possess, or use another person's means of identification, namely the name of victim W.V.?

    Second:   Did you do so without lawful authority?

    Third:    Did you do so during and in relation to the violation of 18 U.S.C. § 1349 charged in Count One of the Information?

Regarding Count Four:

    First:      Did you and one or more persons, in some way or manner, agree to try to accomplish a common and unlawful plan to commit wire fraud against a local Florida government agency, as charged in the Information?

    Second:   Did you know the unlawful purpose of the plan and willfully join in it?

Regarding Count Five:

    First:      Did you knowingly intended to commit the crime of wire fraud against the U.S. Small Business Administration, in violation of 18 U.S.C. § 1343?

    Second:   Was your intent strongly corroborated by you taking a substantial step toward committing the crime?

Defendant's Initials _____  25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                           CASE NO. 6:21-cr-138-ACC-EJK

KEITH INGERSOLL

FACTUAL BASIS

Beginning in about April 2016 and continuing through November 10, 2021, in the Middle District of Florida and elsewhere, KEITH INGERSOLL (INGERSOLL), JAMES ADAMCZYK (ADAMCZYK), and others conspired to commit wire fraud against victim L.W. On July 2, 2021, in the Middle District of Florida and elsewhere, INGERSOLL committed wire fraud against victim L.W. On August 1, 2017, in the Middle District of Florida, INGERSOLL used the name and signature of W.V. without lawful authority and in relation to the conspiracy to commit wire fraud.

Beginning in about January 2017 and continuing through August 2017, in the Middle District of Florida and elsewhere, INGERSOLL, ADAMCZYK, and others conspired to commit wire fraud in relation to the purchase of a property in Winter Springs, Florida.

On March 31, 2020, in the Middle District of Florida and elsewhere, INGERSOLL attempted to commit wire fraud with respect to an Economic Injury Disaster Loan from the U.S. Small Business Administration.

Defendant's Initials _____  26

## I.     Scheme to Defraud L.W.

### A.   Overview of Fraud Scheme

Between April 2016 and November 2021, INGERSOLL and his co-conspirators fraudulently induced L.W. to provide $12.7 million in purported financing to INGERSOLL. INGERSOLL fraudulently represented to L.W. that INGERSOLL or entities controlled by him had entered into contracts to purchase various real estate in Florida, Alabama, Illinois, Nebraska, and the Bahamas.   INGERSOLL, ADAMCZYK, and other co-conspirators fraudulently represented to L.W. that the funds that he provided would be used as refundable deposits for the purchases of this real estate. They further promised that L.W. would receive 9% interest on the refundable deposits, as well as a share of profits from the sale of the real estate that was sold. They also falsely claimed that L.W.'s refundable deposits were held in escrow or by an escrow agent. In fact, INGERSOLL, ADAMCZYK, and other conspirators spent the proceeds received for their own personal benefit, including for luxury car rentals, travel, and adult entertainment.

As part of the conspiracy and scheme to defraud, INGERSOLL, ADAMCZYK, and other conspirators provided L.W. with fraudulent contracts that were signed by fictitious sellers, that were for properties that did not exist, and that contained a forged signature.   INGERSOLL, ADAMCZYK, and

Defendant's Initials _____ 27

other conspirators also falsely represented that the proceeds provided by L.W. were being held in escrow by an attorney, that the sellers of the properties had signed contracts to sell the properties, that purchasers were interested in buying the properties, and that those purchasers had signed contracts to buy the properties. Some of the properties that were the subject of the conspiracy and scheme are summarized in more detail below. The following chart provides an overview of some of the categories of fraudulent conduct associated with those properties:

| Transaction | False rep. regarding being held in escrow by an attorney | Fictitious Seller/Non-existent entity involved in transaction/ entity that did not own the property | Fraudulent Contract | False rep. regarding purchaser | Document signed by a fictitious individual or someone without authority or containing a forged signature |
|---|---|---|---|---|---|
| Marion County | Yes | Yes | Yes | | Yes |
| Hospital in Nebraska | Yes | | Yes | | Yes |
| Lyford | Yes | Yes | Yes | | Yes |
| Ft. Lauderdale | Yes | Yes | Yes | Yes | Yes |
| Daytona | Yes | Yes | Yes | Yes | Yes |
| B.C. Refinancing | Yes | Yes | Yes | | Yes |

Defendant's Initials _____   28

**B.    Background**

L.W. met INGERSOLL in approximately 2012 or 2013, following which L.W. and INGERSOLL engaged in a number of real estate deals together. Early in their business relationship, L.W. purchased lots that were found by INGERSOLL. L.W. used his funds to purchase the lots and still owns them. Under their agreement, INGERSOLL was entitled to a percentage of the proceeds received when the properties were sold.

Beginning in approximately 2016, however, INGERSOLL initiated the above-referenced scheme, falsely claiming that funds that L.W. provided would be used as refundable deposits for real estate deals. For the first several years of the conspiracy and scheme, INGERSOLL represented that an individual whom he said was an attorney would hold the refundable deposits. In actuality, that individual had been suspended from the practice of law (referred to herein as the "Suspended Attorney").[2] L.W. never met the Suspended Attorney in person nor spoke with the Suspended Attorney by phone. The only communication L.W. had with the Suspended Attorney was by email or through INGERSOLL.

INGERSOLL represented to L.W. that as the escrow agent, the Suspended Attorney would hold the deposits until closing and possibly serve as

---

[2] the Suspended Attorney was admitted to practice in 1996 and was disciplined in 2008; his last registered year as an attorney was 2006.

Defendant's Initials _____ 29

the closing agent for the deals. Between October 2017 and February 2019, L.W. sent $4,850,000 to the Suspended Attorney that INGERSOLL and the Suspended Attorney promised would be held in escrow and for which L.W. would receive interest. Contrary to the promises that INGERSOLL had made to L.W., none of those funds were held in escrow. Rather they were spent by INGERSOLL, the Suspended Attorney, ADAMCZYK, and other conspirators.

In 2019, ADAMCZYK replaced the Suspended Attorney as the escrow agent. ADAMCZYK and INGERSOLL had a long term, pre-existing association, which INGERSOLL never disclosed to L.W. L.W. believed that the escrow funds held by the Suspended Attorney were transferred to ADAMCZYK and that, going forward, L.W.'s refundable deposits were transferred to ADAMCZYK's escrow account. ADAMCZYK also provided L.W. with an agreement stating that ADAMCZYK was holding the money. ADAMCZYK represented that he was an attorney by, among other things, using terms such as "Esq" and "ATTY" after his name on documents. In fact, ADAMCZYK has never been a licensed attorney in Florida or Wisconsin.

Between June 2019 and April 2021, L.W. sent $7,850,000 to ADAMCZYK that INGERSOLL and ADAMCZYK promised would be held in escrow and for which L.W. would receive interest. Contrary to the promises

Defendant's Initials _____   30

that INGERSOLL and ADAMCZYK made to L.W., none of these funds were held in escrow. Rather they were spent by INGERSOLL, ADAMCZYK, and other conspirators.

### C.  Marion County Properties

Three sets of properties for which L.W. provided funds were located in Marion County in the Middle District of Florida. INGERSOLL represented that he had deals in place to purchase those properties. In fact, INGERSOLL did not have pending transactions involving any of those properties.

*St. James LandTrust*

On August 1, 2017, INGERSOLL sent an email to L.W. that included a copy of a contract to purchase a property from the St. James LandTrust. The attached contract was a "Conditional Real Estate Purchase Agreement" between companies C.A.W and A.H. The contract provided for the development of certain real property in Marion County into residential lots as shown in an attachement.

Also, on August 1, 2017, INGERSOLL sent an email to L.W. attaching a contract that purported to reflect a sale to Ingersoll Financial, LLC[3] of 69 of these lots by the St. James LandTrust. W.V. was the individual whose signature

---

[3] Ingersoll Financial LLC is an entity registered with the State of Florida by INGERSOLL. Records indicate that the entity was active until September 2018.

Defendant's Initials _____   31

purported to be on the contract on behalf of the St. James LandTrust as its "Trustee." His address was listed as #### NE 60th Lane, Ocala, Florida. The contract represented that the 69 lots were being sold for $1.1 million, with a $250,000 deposit to be "held in escrow by [the Suspended Attorney"], JD." The closing date was set for November 10, 2017. The attachment to the contract identified the 69 lots and was signed by W.V. as the "seller."

A search of the Marion County Property Appraiser's website for the subdivision name of "St. James" showed that A.H., in fact, purchased real estate from C.A.W. in or about February 2017. But a search of that website further revealed that none of the 69 lots identified in the contract signed by W.V. were then owned by the "St. James LandTrust" or W.V.

When interviewed, W.V. explained that he knows the Suspended Attorney, who is his brother-in-law. W.V. advised that he also knows INGERSOLL. W.V stated that he does not have, nor has he ever had, any dealings with St. James LandTrust or any other commercial property and that he never gave anyone permission to use his name for such a transaction.

INGERSOLL knows W.V. When INGERSOLL sent L.W. a copy of a contract purported to be signed by W.V. on August 1, 2017, INGERSOLL knew that W.V. was not a part of the conspiracy and INGERSOLL deliberately avoided learning whether W.V. gave lawful authority to use his signature.

Defendant's Initials _____   32

As noted above, the address listed for W.V. was #### NE 60th Lane, Ocala, Florida. In actuality this address was the Suspended Attorney's residential and mailing address from October 24, 2016 to February 10, 2017.

On August 1, 2017, the Suspended Attorney sent an email to INGERSOLL with instructions for L.W. to wire the $250,000 deposit "for the astonishing James deal in Marion County" to the Suspended Attorney's Bank of America account (#8374). On August 2, 2017, one of L.W.'s employees advised that the $250,000 wire transfer for the St. James refundable deposit had been made. The employee sent an email to the Suspended Attorney, L.W., and INGERSOLL confirming that payment.

Contrary to the promise that INGERSOLL had made to L.W. to keep his funds as refundable deposits in escrow, those $250,000 in funds did not remain in the Suspended Attorney's Bank of America account (#8374). In a pattern seen in other transactions related to the scheme, the Suspended Attorney immediately wired funds to other members of the scheme. On August 3, 2017, for instance, the Suspended Attorney transferred $140,000 to an account that ADAMCZYK had at Seacoast Bank in the name of Shooter's Orlando Inc. Then, that same day, ADAMCZYK transferred $134,000 of the funds that he had received from the Suspended Attorney to one of INGERSOLL's accounts

Defendant's Initials _____   33

at Seacoast held in the name of INGERSOLL's company KI Consulting Group LLC (#9461).

### *G.P. and F.E.*

On August 30, 2017, the Suspended Attorney sent an email to L.W. and INGERSOLL with a copy of two executed agreements for properties in Marion County, Florida, which his email stated were owned by the same seller. One of the contracts claimed to be a sale by G.P. to Ingersoll Financial, LLC for Parcel One for $2.5 million. For the transaction, a $150,000 deposit would be "held in escrow by [the Suspended Attorney], JD." The closing date was March 28, 2018. The individual signing for the seller was identified as L.S.

The other contract claimed to be a sale by F.E. to Ingersoll Financial, LLC for Parcel Two for $1.225 million. For the transaction, a $150,000 deposit would be "held in escrow by [the Suspended Attorney], JD." The closing date was February 28, 2018. The individual signing for the seller was L.S.

These contracts were a fabrication. In fact, on March 25, 2021, G.P. sold Parcel One to O.E.F. for $785,629.37. On February 25, 2021, G.P. executed a Quitclaim Deed to grant Parcel Two to F.E.

On August 30, 2017, INGERSOLL emailed the Suspended Attorney copying L.W., stating "Great job getting this done so fast [the Suspended Attorney]."

Defendant's Initials _____   34

On August 31, 2017, L.W. caused $300,000 in wire transfers to be made for the requested G.P. and F.E. refundable deposits. Bank records confirm that on this date two $150,000 wire transfer deposits were made into the Suspended Attorney's Bank of America Account (#8374) from accounts controlled by L.W. at Bank of America (#0413). The wire transfer details for the first $150,000 wire transfer deposit were the name of company G.P. and the details for the second $150,000 wire transfer deposit were the name of company F.E.

Contrary to the promise that INGERSOLL had made to L.W. to keep his funds as refundable deposits in escrow, the $300,000 in funds did not remain in the Suspended Attorney's Bank of America Account (#8374). The Suspended Attorney wire immediately transferred funds to other members of the scheme. On August 31, 2017, the Suspended Attorney wire transferred $158,750 to an account that INGERSOLL had at Seacoast National Bank in the name of KI Consulting Group, LLC. Additional withdrawals were made from the Suspended Attorney's Bank of America Account (#8374) on August 31, 2017, September 1, 2017, and September 5, 2017. On September 1, 2017, the Suspended Attorney emailed L.W. and INGERSOLL confirming that he had received the $300,000 "for the newest projects in Marion County."

None of the three Marion County property deals have ever been completed. To lull L.W. into believing that his deposits were safe and being held

Defendant's Initials _____ 35

in escrow, INGERSOLL, the Suspended Attorney, and later ADAMCZYK, sent L.W. emails, letters, and agreements falsely representing that the owners of the properties had agreed to an extension of the deals, which they knew were false representations.

L.S. was the owner of G.P. and F.E. until his death on April 11, 2018. L.S.'s sibling, H.S., signed the annual reports for G.P. for 2019, 2020, and 2021. In an interview, H.S. verified that the F.E. property was sold and that she signed a Quitclaim deed transferring G.P. to F.E. on February 24, 2021. H.S. stated that there had been no prior pending contracts on either property. H.S. reviewed the contracts allegedly signed by L.S. and stated that the signatures for L.S. were not in L.S.'s handwriting.

### D.   Hospital in Nebraska

In October 2017, INGERSOLL falsely claimed to have obtained a contract for the purchase of a hospital in Nebraska.  The hospital exists, and it was for sale.  INGERSOLL, however, never had a contract to purchase the property, but concocted a fake one to defraud L.W. into providing funds to be held in escrow as a refundable deposit.

On October 10, 2017, INGERSOLL sent an email to L.W., copying the Suspended Attorney, and attaching what INGERSOLL claimed was "the contract I just received signed by seller for the 100,000 sq ft building in

Defendant's Initials _____     36

Nebraska." INGERSOLL told the Suspended Attorney that "once [L.W.] is ok with contract please forward over your wiring instructions for deposit that's refundable in buyers sole discretion."

The contract attached to INGERSOLL's October 10, 2017 email was fraudulent. The contract represented that it was dated October 2, 2017, and was between the Ingersoll Financial Group and the trust that owned the hospital. The sale price was listed as being $1.3 million, with a refundable $425,000 deposit held by the "Escrow Agent," identified as "[the Suspended Attorney] on J.D." The closing date was listed as December 31, 2017. A co-conspirator of INGERSOLL, co-conspirator 2, purported to sign for the seller. In fact, co-conspirator 2 was not authorized to sign the contract, lived in Florida (not Nebraska), and had no connection to the entity that owned that property. As further set forth below, co-conspirator 2 was paid to participate in this part of the scheme.

On October 11, 2017, L.W. caused an interstate wire transfer in the amount of $425,000 to be made from the Middle District of Florida to the Suspended Attorney's Bank of America account #8374 in Illinois. After receiving those funds, the Suspended Attorney caused $389,300 of those funds to be wired from his Bank of America account to one of INGERSOLL's accounts for KI Consulting Group LLC at Seacoast (account #0556). This

Defendant's Initials _____ 37

transaction was contrary to representations that INGERSOLL and the Suspended Attorney made to L.W. about keeping the deposit in escrow to be refunded to L.W. at a later date.

The next day, October 12, 2017, INGERSOLL transferred $45,000 from account #0556 to a different account for KI Consulting Group LLC at Seacoast (account #9461). On October 12, 2017, INGERSOLL used those funds to write a check from account #9461 to co-conspirator 1 in the amount of $45,000. The memo line of the check also referenced co-conspirator 2, who was a close associate of co-conspirator 1.

After this, the scheme continued. On October 12, 2017, INGERSOLL sent an email to L.W. and the Suspended Attorney, with a copy to co-conspirator 2, and attached the "[f]ully executed contract."

When interviewed by law enforcement, the listing agent for the hospital, K.M., confirmed that the property was for sale in the fall of 2017, but stated that the building is just 60,000 square feet and had never been listed for an amount above $650,000. K.M. stated that on September 25, 2017, she was contacted via phone by co-conspirator 1. Co-conspirator 1 indicated to K.M. that he was interested in purchasing the old hospital. K.M. stated that she provided co-conspirator 1 with the specifics on the building, including the listing price of $650,000. Co-conspirator 1 responded that he would email a purchase

Defendant's Initials _____   38

agreement for the property to K.M. K.M. then asked co-conspirator 1 if he would like to come see the property first and co-conspirator 1 responded that he would look at the property during the due diligence period.

Co-conspirator 1 emailed K.M. a signed purchase agreement for $650,000. The purchase agreement was modified by the seller and then executed on November 27, 2017. The agreement provided a 10-day grace period for a $25,000 deposit to be placed with a Title Insurance Company. No deposit was ever made and the 10-day window came to a close. A letter was sent cancelling the purchase agreement and K.M. never heard from co-conspirator 1 again.

In the meantime, on November 26, 2017, co-conspirator 1 sent an email to INGERSOLL on or about November 26, 2017, claiming that the hospital was cancelling the sale due to "the fact that we never received fully executed PSA and acceptance of the offer from your buying entity."  The purpose of this email was to extract more funds from L.W.  On or about November 26, 2017, INGERSOLL forwarded the November 26, 2017 email to L.W. and the Suspended Attorney falsely claiming "I got us a better deal lower price for [the hospital]. Let me know later today. Money still needs to stay [the Suspended Attorney]."

On November 29, 2017, co-conspirator 2 sent a purported signed addendum for the hospital transaction to INGERSOLL.  As noted above, co-

Defendant's Initials _____   39

conspirator 2 had no connection to the entity that owned the hospital, which INGERSOLL knew because co-conspirator 2 was the girlfriend of INGERSOLL's friend at the time, co-conspirator 1. The addendum did not reflect an overall lower price. Rather, it required another deposit of $175,000 in "refundable earnest money" to be paid to the "Escrow Agent" of "[the Suspended Attorney], J.D." In exchange, they would purportedly receive a 120-day extension of the due diligence period.

On November 29, 2017, INGERSOLL sent an email to the Suspended Attorney, with a copy to L.W., including a copy of the signed Addendum. INGERSOLL asked the Suspended Attorney to "forward [L.W.] your wire instructions in a separate email." On November 29, 2017, INGERSOLL sent to L.W., with a copy to the Suspended Attorney, a "[f]ully executed agreement" that had his signature.

On November 30, 2017, L.W. caused an interstate wire transfer to be conducted from the Middle District of Florida to the Suspended Attorney's Bank of America account #8374 in Illinois for $175,000. The Suspended Attorney then caused a $100,000 wire transfer to be made from his Bank of America account in Illinois to ADAMCZYK's account for Shooters Orlando Inc. at Seacoast (account #9626). Also on November 30, 2017, ADAMCZYK used his account for Shooters Orlando Inc. at Seacoast (account #9626) to write

Defendant's Initials _____   40

a $95,000 check to KI Consulting Group. On November 30, 2017, in the Middle District of Florida, INGERSOLL deposited that check into one of his accounts for KI Consulting Group at Seacoast (account #0556).

In addition to transferring funds to ADAMCZYK's Shooters of Orlando account at Seacoast, the Suspended Attorney also transferred $50,000 to co-conspirator 2's Seacoast account #1896 on November 30, 2017, which is consistent with co-conspirator 2 being compensated for her role in this part of the scheme.

From October 2017 through 2021, INGERSOLL falsely represented to L.W. that the hospital transaction was legitimate and that it had been extended with the owner's authorization, which, as INGERSOLL knew, was not true because the true owner had never agreed to any such extension. INGERSOLL also sent a number of emails to L.W. to convince L.W. that the transaction was legitimate when he knew that it was not.

### E.    Lyford Cay

As a part of the continuing fraud scheme, the Suspended Attorney and INGERSOLL defrauded L.W. into providing approximately $6 million in relation to a purported deal in the Bahamas for a property named Lyford Cay. As with the other fraudulent property deals, L.W. believed the money was being used as a refundable deposit and being held in escrow. In relation to this deal,

Defendant's Initials _____  41

L.W. was provided a document that purported to have been prepared by an entity with the initials of B.C., LLP. This document was fraudulent.

This B.C., LLP document listed an address of 250 Park Avenue, New York, NY 10177 on the cover page. The document purported to be an "Agreement for Funding" by which B.C., LLP agreed to provide a loan for the construction of 30 condominium units in Lyford Cay, Nassau, New Providence, Bahamas. The amount of the funding purported to be $60 million. The contract stated that a $6 million "Cash Collateral" would be "deposited and held by [the Suspended Attorney], JD in escrow." The contract reflected that the "Cash Collateral" would be "refundable at Borrower's discretion during the due diligence phase." The borrower was identified as one of L.W.'s business entities.

The contract purported to have been executed by "Raymond Beckwith, Jr., Senior Partner, for B.C., LLP." The contract listed the Suspended Attorney as the "Escrow Agent," and contained INGERSOLL's signature as the "Authorized Agent" of the L.W. entity. The contract was dated February 11, 2019, with a closing date of April 25, 2019. A portion of the document, entitled "Schedule of Funding," represented that the initial funding of $20 million would be released to the Suspended Attorney and that the Suspended Attorney at that point would release the $6 million of "Cash Collateral" back to L.W.'s

Defendant's Initials _____   42

entity. The Suspended Attorney represented that he would hold each release in his account until B.C., LLP approved each construction phase or portion thereof.

In reality, this contract was fraudulent. The contract identifies the Lender as B.C., LLP, but also inconsistently refers to the same entity in various places of the contract as B.C., LLC. As set out in more detail below, there is no "Senior Partner" by the name of Raymond Beckwith. Instead, Raymond Beckwith, Jr., sometimes referred to as Ray Beckworth, is a name of a fictitious person who INGERSOLL created to facilitate his fraud against L.W. to convince him that INGERSOLL had a legitimate relationship with B.C. Further, the address on the document is fraudulent. The address listed on the fraudulent contract resolves to a multi-unit building where B.C. has never been a tenant. As INGERSOLL knew at the time that he made representations to L.W. about Lyford Cay and B.C., his representations about B.C. were false. INGERSOLL knew that the contract that he provided L.W. was fabricated, that B.C. had not been engaged in negotiations with him about Lyford Cay, and that Ray Beckworth was a fictitious person used to further the conspiracy and scheme.

INGERSOLL and the Suspended Attorney used this fraudulent contract to obtain more funds from L.W. Starting in 2018, INGERSOLL claimed to be

Defendant's Initials _____ 43

in contact with B.C. regarding real estate deals. These claims are memorialized in text messages between INGERSOLL and L.W.

On August 30, 2018, L.W. caused a wire transfer in the amount of $1.5 million to be made into the Suspended Attorney's Regions Bank account (#6872) in relation to the "B." property deal. On that same date, the Suspended Attorney caused two interstate wire transfers to be made from his Regions Bank account (#6872). One transfer was in the amount of $800,000 to ADAMCZYK's Daystar Investments account at Seacoast Bank (#3306) and the second transfer was in the amount of $600,000 to ADAMCZYK's Shooters of Orlando, Inc. bank account at Fifth Third Bank (#2028). ADAMCZYK then transferred $760,000 from his Daystar Investments account at Seacoast Bank (#3306) that same day to INGERSOLL's KI Consulting Group, LLC account at Seacoast Bank (#2507). Later the same day, ADAMCZYK transferred $550,000 from his Shooters of Orlando, Inc., Fifth Third Bank account (account #2028) to INGERSOLL's KI Consulting Group, LLC account at Seacoast Bank (#2507). All of these transactions, and others set forth below, were contrary to the representations that INGERSOLL and the Suspended Attorney made to L.W. about keeping deposits in escrow to be refunded to L.W. at a later date.

Defendant's Initials _____     44

In October 2018, L.W. and INGERSOLL exchanged text messages about getting an addendum from B.C. Specifically, on October 8, 2018, INGERSOLL advised that he would "get on B[.] this morning." On October 30, 2018, L.W. texted INGERSOLL that, "[w]e need to [sic] financing letters or [the Suspended Attorney] and B[.] today."

On November 7, 2018, L.W. texted INGERSOLL about calling him "about B[.] commitment 4 Lyford Cay." That same day, L.W. texted INGERSOLL:

> We need a written commitment like we had previously. 60 million dollars. Change the name to [L.V.] group as trustee under agreement Lyford Cay Holdings Trust and add $1000000 deposit to be delivered when we reach agreement on the draft documents.

INGERSOLL replied to L.W.'s text message, stating: "Working on it now."

On February 11, 2019, the Suspended Attorney sent an email to L.W. and INGERSOLL with the wiring instructions for the additional $1,000,000 deposit required from L.W. That same day, L.W. caused an interstate wire transfer of $1 million to be made to the Suspended Attorney's account at Regions Bank (#6872). The next day, the Suspended Attorney wired $925,000 from his Regions Bank account (#6872), originating in Illinois, to ADAMCZYK's account for Daystar Investments at Fifth Third Bank (#2592) in the Middle District of Florida. ADAMCZYK then wired those funds as follows:

Defendant's Initials _____ 45

| | | |
|---|---|---|
| 2/12/2019 | Ingersoll Group, LLC Seacoast # 3301 | $150,000 |
| 2/12/2019 | Shooters of Orlando Fifth Third #2028 | $15,000 |
| 2/12/2019 | Shooters of Orlando Cashiers Check | $50,000 |
| 2/12/2019 | INGERSOLL Cashiers Check with memo: "Midwest Land Trust Ingersoll" | $350,000 |
| 2/14/2019 | INGERSOLL Wells Fargo #0935 | $308,000 |

On February 27, 2019, L.W. texted INGERSOLL:

> Keith. Call me this morning with an update. Do you or don't you have the purchase contract yet for Lyford. Time is moving because black was supposed to provide the documents this week. I think

INGERSOLL responded:

> B[.] said they are getting us the docs no later than March 7th. I just spoke to [the Suspended Attorney]. Also, they are flying me back to Bahamas to give me purchase contract and transfer info Saturday. Everything is a go, just had to do some standard probate thing.

On May 21, 2019, INGERSOLL sent a text message to L.W. stating:

> I will have the conveyance development agreement done and then push B[.] back in. Also, [the Suspended Attorney]'s partner is working on it for us.

INGERSOLL identified "[the Suspended Attorney]'s partner" in a later text message as ADAMCZYK. On May 23, 2019, INGERSOLL sent a text message to L.W. to ask for the last $1 million of the $6 million "Cash Collateral" for the B.C. financing for Lyford Cay. In a series of three text messages,

Defendant's Initials  46

INGERSOLL stated that ADAMCZYK, who he represented was the Suspended Attorney's "partner," would be sending the documents.

In fact, the real reason why ADAMCZYK took on a more active role in the fraud scheme at this time was that the Suspended Attorney had died on April 25, 2019, in Ocala, Florida. ADAMCZYK was not a lawyer nor a law partner of the Suspended Attorney. Instead, his role up to this point in the scheme, as has been detailed above, was to serve as a conduit of fraud proceeds from the Suspended Attorney to INGERSOLL for which he received some of the fraud proceeds himself. After the Suspended Attorney's death, ADAMCZYK substituted in for the Suspended Attorney as the purported attorney serving as an escrow agent in the fraud scheme.

INGERSOLL's request for L.W. to pay another $1 million for what L.W. believed was the B.C. transaction involving Lyford Cay was successful. On June 5, 2019, L.W. caused a wire transfer of $1 million to be made to ADAMCZYK's account at Fifth Third Bank (#4052) in the Middle District of Florida. Similar to prior transactions, ADAMCZYK then routed most of those funds to INGERSOLL.

**F.   Fort Lauderdale**

On August 27, 2019, INGERSOLL signed a purported contract on behalf of Ingersoll Financial Group, LLC to purchase a piece of real estate in Broward

Defendant's Initials _____   47

County, Florida. The contract purported to be between Ingersoll Financial Group, LLC and the Fort Lauderdale Land Trust No. 6. The property was identified as Parcel Id # ********0070. The purchase price was listed as $3.7 million, with a $1.25 million earnest money deposit to be "delivered to Buyer's choice of title company (% Mr. James Adamczyk, Esq.)." It was executed by INGERSOLL and "Ryan Williams" on behalf of the seller. Fort Lauderdale Land Trust No. 6 was identified as a Nevada partnership.

This contract was fraudulent. Parcel Id #********0070 has been owned by company Y.C. since approximately February 2018. There is no entity by the name of Fort Lauderdale Land Trust No. 6 in Nevada. The owner of company Y.C., D.C., confirmed that that no one by the name of "Ryan Williams" works for or represents Y.C. and that INGERSOLL, ADAMCZYK, and L.W. have no business with Y.C.

On August 28, 2019, L.W. caused a wire transfer of $1,250,000 to be made from an account at Bank of America (account #3490) in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida. That same date, as with prior transactions, ADAMCZYK routed most of those funds to INGERSOLL.

On September 18, 2019, L.W. texted INGERSOLL for an update on offers for the Fort Lauderdale property: "Also should we now be getting offers

Defendant's Initials _____   48

on the Fort Lauderdale property. It seemed very hot last week. what's happening." On September 19, 2019, INGERSOLL texted back: "I'm waiting on written offers on Lauderdale now."

INGERSOLL represented to L.W. via text message that a company named T.S. was interested in the Fort Lauderdale property. On October 15, 2019, L.W. sent a text message to INGERSOLL, asking: "What's going on with [T.S.] and Lauderdale." INGERSOLL replied back via text message: "I am mtg with them Friday and have another group making an offer on it Thursday."

INGERSOLL's claims about T.S. and Parcel Id # ********0070 in Broward County were not true. T.S. has no records relating to any potential property transaction located in Broward County with INGERSOLL or any of his entities.

In November 2019, L.W. provided additional funds in relation to the deal for Parcel Id # ********0070. On November 20, 2019, L.W. caused a wire transfer of $875,000 to be made from an account at Bank of America in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida. Over the course of the next several days ADAMCZYK routed most of these funds to INGERSOLL.

In January 2020, L.W. requested that ADAMCZYK execute a document confirming that L.W.'s refundable deposits were being held in connection with

Defendant's Initials     49

projects for which the expiration date for the due diligence period were extended. On January 10, 2020, ADAMCZYK executed the agreement, and he emailed a copy to INGERSOLL. On January 10, 2020, INGERSOLL forwarded a copy of ADAMCZYK's email and executed agreement to L.W. Exhibit A to this agreement listed "all the outstanding wire transfers of refundable deposit funds which [L.W.] ha[d] made to your firm ([the Suspended Attorney] & Jim) now totaling $9,753,000." L.W. also attached Exhibit B, which listed "the related projects, the deposit amount totaling $9,753,000 and the requested expiration dates for the due diligence periods."

ADAMCZYK also executed a "Global Extension Exhibit" affirming as follows:

HE HAS BEEN AUTHORIXED AND EMPOWERED BY EACH OF THE SELLER'S IDENTIFIED FOR THE CONTRACTS LISTED BELOW TO ACT ON THEIR BEHALF IN CONNECTION WITH EXTENDING THE DUE DILIGENCE/INVESTIGATION PERIODS FOR EACH OF THE LISTED CONTRACTS, THE REFUNDABLE DEPOSITS TOTALING $9,753,000 WILL REMAIN REFUNDABLE THRU THE LISTED NEW EXTENSION DATE FOR EACH CONTRACT.

The following was immediately underneath his signature: "BY: JIM ADAMCZYK, ATTY AS ESCROW AGENT AND AUTHORIZED REPRESENTATIVE."

At the time that ADAMCZYK executed the agreement, L.W. believed that the due diligence period for the Fort Lauderdale transaction was set to

Defendant's Initials _____ 50

expire on March 30, 2020. On March 19, 2020, ADAMCZYK sent an email to
INGERSOLL, which INGERSOLL forwarded on March 19, 2020 to L.W.,
claiming to extend the inspection period until June 30, 2020, and advising about
the alleged interest of an alleged purchaser of the property (a company by the
name of Sky Builders).

That same day, L.W. sent an email to INGERSOLL stating that
ADAMCZYK's email was not good enough, that L.W. wanted to see how
ADAMCZYK had the authority to extend the contract, and that it was best to
get an extension from the owner of the property and "not our own atty." L.W.
received a copy of a Second Amendment to Florida Residential Purchase
Agreement that was alleged to be signed by Ryan Williams on behalf of the Fort
Lauderdale Land Trust No. 6, which represented that the inspection period was
extended through June 30, 2020.

INGERSOLL used the possibility of Sky Builders as purchaser of the
property to distract L.W. from what INGERSOLL had represented regarding
T.S.  For example, on April 22, 2020, INGERSOLL sent a text message to L.W.
saying: "Said we have T[.S.] on our heels. Problems is T[.S.] isn't paying close
to as much as Sky builders." On May 21, 2020, INGERSOLL sent a text
message to L.W. claiming that Sky Builders was going to be involved in
purchasing three of the deals that L.W. had funded.

Defendant's Initials_____   51

Between June and August 2020, INGERSOLL sent L.W. a number of text messages providing fraudulent updates about progress being made with respect to the Fort Lauderdale contract. On August 26, 2020, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL, confirming that L.W. had wire transferred $250,000, *i.e.* the funds to be used as the refundable deposit for the Fort Lauderdale contract. L.W.'s email included a copy of the Third Amendment to Florida Residential Purchase Agreement. The Third Amendment was allegedly signed by Ryan Williams on behalf of the Fort Lauderdale Isles Trust No. 6. It provided for an extension of the inspection period through February 12, 2021, in exchange for $250,000 in earnest money.

On August 26, 2020, L.W. caused a wire transfer of $250,000 to be made from an account at Bank of America in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida). ADAMCZYK then routed most of these proceeds to INGERSOLL.

INGERSOLL and ADAMCZYK knew that various Amendments to the purchase agreements sent to L.W. were false. They knew that Fort Lauderdale Isles Trust No. 6 was not a real entity, that it did not own the property that was the subject of the contract, that they were not involved in any negotiations with the actual owner of the property, and that Ryan Williams was not a real person, but a fictitious name used to facilitate the fraud.

Defendant's Initials _____  52

In September and October 2020, INGERSOLL continued to provide fraudulent updates to L.W. about the status of the Fort Lauderdale transaction. Then, on October 28, 2020, INGERSOLL sent an email to L.W., stating that "[i]t's been executed by them and I went ahead and signed it. Let me know when I can send to Adamczyk." The attached contact was entitled, "Florida Residential Purchase Agreement." It purported to be between Sky Builders 10, LLC, a Florida Limited Liability Company, and Ingersoll Financial Group, LLC. The contract provided for a $9.1 million purchase price for the Fort Lauderdale property, which was identified by address (xxxx Whale Harbor Ln., Fort Lauderdale, Florida 33312) and an attached legal description (including parcel ID # ********0070). The contract provided that the purchaser would deposit $750,000 of earnest money in ADAMCZYK's escrow account, with the contract identifying ADAMCZYK as "James P. Adamczyk, Esq." INGERSOLL signed the contract on behalf of Ingersoll Financial Group, LLC, and Mark Smith purportedly signed on behalf of Sky Builders 10, LLC.

This contract is also fraudulent. There is no company named Sky Builders 10, LLC registered with the Florida Department of State. As INGERSOLL and ADAMCZYK knew, this company was fabricated to facilitate the fraud scheme. They also knew that "Mark Smith" was a fictitious name used on the purported contract.

Defendant's Initials _____  53

After receiving what he believed was the executed contract by Sky Builders 10, LLC, L.W. provided additional funds to ADAMCZYK. On October 29, 2020, L.W. caused a wire transfer of $1.5 million to be made from PMSG's account at Bank of America in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida. Over the next two days, ADAMCZYK then routed most of these proceeds to INGERSOLL.

### G.   Daytona Beach Properties

On January 31, 2020, INGERSOLL sent a text message to L.W. that read, "[n]eed you for deposit ASAP. Got deal done. I'm soooo excited partner." INGERSOLL explained, "[e]very person on planet wants this deal. I got it." After L.W. asked, "Which deal," INGERSOLL stated, "Daytona." INGERSOLL claimed to have a contract and asked that L.W. "[p]lease send wire my friend" and that "[w]e got it." INGERSOLL stated: "Money isn't due till Tuesday but I told them we would get escrow letter out ASAP. Everyone wants this deal like crazy."

INGERSOLL provided L.W. with what was represented as being a Florida Residential Purchase Agreement between KI 39 Land Trust No. 850 and C., a Delaware Land Trust, with "Mark Williams" as the trustee. The Agreement allegedly was signed by Mark Williams. The purchase price for the

Defendant's Initials _____   54

856 acres was set at $31 million, with a $1.25 million earnest money deposit to be "delivered to Mr. James Adamczyk, Esq. ('Escrow Agent')[.]" Exhibit A to the Agreement was a description of the property. In the bottom left hand corner of each page of the property description, there was a number (9368101), the significance of which is explained below.

As INGERSOLL and ADAMCZYK knew when this contract was sent to L.W., it was fraudulent.  INGERSOLL and ADAMCZYK knew that the C. entities had no involvement with any of the Agreements or Amendments to the agreements that were provided by INGERSOLL to L.W. in connection with the alleged transactions involving 850 acres and 128 acres.  A representative of the C. entities has confirmed that none of the C. entities had any involvement with any of the Agreements or Amendments to the agreements that were provided by INGERSOLL to L.W. in connection with the alleged transactions involving 850 acres and 128 acres and that none of them have any individual affiliated with them by the name of "Mark Williams."  Indeed, none of the C. entities have any documents related to any transactions involving INGERSOLL.

L.W., however, did not know any of that.  On February 3, 2020, in reliance upon the false representations that had been made about the transaction,  L.W. caused a wire transfer of $1.25 million to be made from an

Defendant's Initials _____   55

account at Bank of America in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida. Over the course of the next few days, ADAMCZYK routed most of these proceeds to INGERSOLL.

On May 21, 2020, INGERSOLL sent a text message to L.W. stating:

> I got and executed the extension for Daytona till Dec 3 2020 with all soft money. Wow. Have offer coming ASAP for deal. [Major Energy Company] is leading offer , but *confidential*. Please don't tell anyone.

INGERSOLL went on to claim that the Major Energy Company was "paying 40 million for a small piece for their operations and we get to keep the billboards and all the other important land" and that "I haven't verified yet, but apparently they have already escrowed their money." In fact, as INGERSOLL knew, the Major Energy Company was never involved in the purchase of any property in Volusia County involving INGERSOLL.

On May 21, 2020, L.W. sent an email to ADAMCZYK attaching a copy of a First Amendment to Florida Residential Purchase Agreement. The First Amendment provided that L.W. would pay another $925,000 deposit of earnest money to "the same Escrow Agent." In exchange, the due diligence period would be extended to December 3, 2020. INGERSOLL signed the First Amendment on behalf of the KI 39 Land Trust No. 850, and Mark Williams signed on behalf of C. 39. In the email, L.W. stated that L.W. would send the

Defendant's Initials _____   56

"requisite $925,000 additional refundable deposit to you as soon as we receive current wire instructions from you."

On May 21, 2020, L.W. caused a wire transfer of $925,000 to be made from an account at Bank of America in New York to ADAMCZYK's account at Fifth Third Bank (account #4052) in the Middle District of Florida. ADAMCZYK immediately routed most of these proceeds to INGERSOLL.

On December 16, 2020, L.W. sent a text message to INGERSOLL asking whether they had lost their deposit on the Daytona Beach 850 acre deal, because the due diligence period had expired. INGERSOLL replied via text message that he would get another extension the next day. On December 18, 2020, INGERSOLL sent an email to L.W. with a Second Amendment to Florida Residential Purchase Agreement. The Second Amendment purported to extend the due diligence period to March 20, 2021. INGERSOLL signed on behalf of KI 39 Land Trust No. 850, and Mark Williams purportedly signed on behalf of C. 39.

On December 18, 2020, L.W. sent a text message to INGERSOLL for an update on the transaction involving the Major Energy Company. INGERSOLL replied to the text stating "[t]hey are ready to close first quarter, but we are splitting some of the land for out-front billboard company," which, as INGERSOLL knew, was not true.

Defendant's Initials _____ 57

On March 10, 2021, L.W. texted INGERSOLL about obtaining another extension for the Daytona Beach deal. INGERSOLL texted back that he would have the extension that day or the next. On March 15, 2021, INGERSOLL sent an email to L.W. with a Third Amendment to Florida Residential Purchase Agreement. The Third Amendment purported to extended the due diligence period to November 21, 2021.  INGERSOLL signed on behalf of KI 39 Land Trust No. 850, and Mark Williams purportedly signed on behalf of C. 39.

INGERSOLL then used a fake real estate transaction in Daytona Beach to obtain funds from L.W. On April 8, 2021, INGERSOLL sent a text message to L.W. that he needed to secure "these extra acres for deal. Close all same time with their [the Major Energy Company's] money. Just need to lock up the adjacent property." On April 11, 2021, L.W. sent a text message to INGERSOLL asking for a map of the Daytona Beach deals.

On April 20, 2021, INGERSOLL sent an email to L.W. representing that he had already closed on 165 acres in Daytona Beach (for which he had paid $980,000 and which was valued at $16 million), that he was purchasing 850 acres (for which he was paying $26 million and was valued at $52 million), and that he was purchasing 128 acres (for which he was paying $7.2 million and was valued at $18 million). As INGERSOLL knew, these representations were false,

Defendant's Initials _____ 58

because, among other reasons, he did not have any contracts to purchase the 850 acres or the 128 acres.

On April 21, 2021, L.W. sent an email to ADAMCZYK with a copy to INGERSOLL and others, advising that he was authorizing a wire transfer to ADAMCZYK of $800,000 as a refundable deposit for a real estate deal involving the 128 acres in Daytona Beach.

On April 29, 2021, L.W. sent an email to ADAMCZYK with a copy of a Florida Residential Purchase Agreement. The Agreement was dated April 29, 2021, and it was allegedly between the Ingersoll Financial Group, LLC as the buyer and C. 39-4, LCC, a Delaware limited liability company as the seller. The purchase price was $7.3 million, with an earnest money deposit of $800,000 "delivered to Mr. James Adamczyk, Esq. ('Escrow Agent')." INGERSOLL signed the Agreement on behalf of Ingersoll Financial LLC and Mark Williams signed on behalf of C. 39-4, LLC.

As noted above, the C. entities have confirmed that they had no involvement with any of the Agreements or Amendments to the agreements that were provided by INGERSOLL to L.W. in connection with the alleged transactions involving 850 acres and 128 acres and that there no individual affiliated with them by the name of "Mark Williams."  Indeed, none of the C.

Defendant's Initials _____   59

entities have any documents related to any transactions involving INGERSOLL.

The only records that the C. entities have related to anyone affiliated with INGERSOLL relate to four prior property transactions involving co-conspirator 1, two of which failed. In devising this part of the scheme, INGERSOLL used the same property description attachment that co-conspirator 1 had been provided for a failed effort to purchase property from one of the Crisp entities. The fact that they are the same document is established by the number in the bottom left-hand corner of the pages (9368101).

### H.    B.C. Refinancing

In 2020, L.W. raised the prospect of INGERSOLL refinancing his loans with someone else. INGERSOLL claimed that B.C. was involved in refinancing the loans.

On October 21, 2020, INGERSOLL sent an email to L.W., with a copy to his own email account, that purported to forward an email from Ray Beckwith of B.C. to INGERSOLL. The "Ray Beckwith" email was entitled, "Refinancing of your portfolio," and it provided:

> Keith, this email will memorialize our couple conversations and what we are trying to accomplish:
>
> 1. Re-fi all your contracts holding real property with a deposit which is to be refunded back to your "money guy upon B[.] Closing on refi.

Defendant's Initials _____        60

2. Deposits are being held with your escrow guy and he will provide letter to us stating he is control of the deposits.

3. We cannot refi the money being held in Germany, as our regulations only handle US operations.

4. 6.9% interest rate with a balloon after 36 months but may have an extension, I check.

5. We will provide an interest reserve of 36 months and looks like enough equity (if things go as planned) to do 36 month reserve.

7. Ingersoll will be required to place a 10% refundable deposit with their escrow guy upon executing the deal, as we will work hard to have loan and equity docs out within 60 days and close immediately after.

8. Ingersoll willl provide a 5% kicker of equity for us and a 1% fee which will be built into the loan (I know you didn't want to have out of pocket closing costs.

9. We will need copies of the promisorry notes you have signed to your money partner and we will try and mirror them as much as we can to our liking.

10. We need to get started ASAP. Depending on the election, it could be harder to approve if we haven't started the due diligence and you have the escrow deposit up by execution.

Thanks Keith.  Let me know when you're ready to move Best, Ray!!!!

On October 28, 2020, INGERSOLL sent an email to L.W. that attached a "Term Sheet" that purported to be between Ingersoll, LLC and the B.C. The "Term Sheet" stated that the total cost to refinance INGERSOLL's loans to L.W. was $12,818,947, that the interest rate would be 6.9%, that "James Adamczyk is currently acting as escrow agent for the Project and shall continue to act as Escrow Agent," that INGERSOLL would have to deposit $1,281,894.70 with the Escrow Agent upon execution of the Agreement, and

Defendant's Initials _____   61

that one of the prerequisites of the deal was a "Letter from Escrow Agent confirming Escrow Agent is in control of the deposits." The Agreement provided that it needed to be accepted by October 30, 2020.

On October 29, 2020, INGERSOLL sent an email L.W. with a revised Term Sheet. Two of the changes were to increase the amount of the loan to $15 million and to raise the amount of the deposit to $1.5 million.

On November 12, 2020, INGERSOLL sent an email L.W. with a copy of the executed Term Sheet. INGERSOLL signed the document on behalf of Ingersoll Financial, LLC, and Raymond Beckwith, Jr., Lending Manager, was represented as being the person who signed on behalf of the B.C. The Term Sheet included an Exhibit A, which set forth $12,178,000 of "principal owing held by ADAMCZYK" for various properties for which L.W. had previously provided deposits based on conspirators' false representations.

On December 23, 2020, INGERSOLL sent an email to L.W. with a draft of the Promissory Note to be executed. The Promissory Note claimed that Ingersoll Financial, LLC was promising to repay B.C., LLC, a Delaware limited liability partnership, the principal sum of $15 million. Raymond Beckwith, Jr. was identified as the person to sign for B.C.

Defendant's Initials _____   62

On December 23, 2020, INGERSOLL sent an email to L.W. with a draft Pledge and Security Agreement. The Agreement provided the following address for B.C.:

> B[.] C[.] Group
> Raymond Beckwith, Jr.
> 250 Park Avenue
> New York, NY 10177

In fact, B.C. has never been a tenant at the building located at this address and there is no one by the name of Raymond Beckwith employed at B.C.

On December 10, 2020, L.W. sent a text message to INGERSOLL stating that L.W. would have to withdraw the $6 million that L.W. believed that ADAMCYZK had for the Lyford Cay deal if the B.C. refinancing did not take place. In response, INGERSOLL told L.W. that B.C. would have the deal completed by the next day. INGERSOLL falsely claimed that he was at the "99 yard lin[e]" for the deal.

The B.C. closing never occurred, because, as INGERSOLL knew, it was fictitious from the outset. On January 16, 2021, L.W. asked about it again in a text message to INGERSOLL, "Have my document change has been approved by blackwood. Yes or no[.]" (Sic) INGERSOLL stated that he would be talking with them on "Monday morning."

On January 19, 2021, INGERSOLL claimed in a text message to L.W.:

Defendant's Initials _____   63

B[.] guys are in Washington for inauguration then they return Friday they will send me their finished comments for you to review and accept or change then back to us for final execution.

On March 3, 2021, INGERSOLL claimed in a text message to L.W. that he was waiting to hear back from B.C. In several text messages to INGERSOLL, L.W. asked for the name of the B.C. contact or to talk with that person. On July 2, 2021, INGERSOLL sent an email to the fake email account of Raymond Beckworth, copying L.W. and INGERSOLL **(Count Two Wire)**. This email was processed by a server located outside the State of Florida. INGERSOLL's email appeared to be in response to one that had been sent from the fake Raymond Beckworth email account. INGERSOLL's email stated:

Hi Raymond,

Can we set up a time to reschedule refi on Wednesday and chat? My thoughts would be to get this back on track and get it done before July 25th.

On July 2, 2021, L.W. sent an email to INGERSOLL asking for "RAYS" last name and telephone number. On that same date, L.W. texted the same questions to INGERSOLL. On July 2, 2021, INGERSOLL texted L.W. that Ray's last name was "Beckworth and Beckworth jr." L.W. asked for Ray's phone number, which INGERSOLL did not provide.

After that, L.W. sent text messages to INGERSOLL again on July 6, July 8, and July 9, 2021, asking to talk with Raymond Beckworth of B.C.

Defendant's Initials _____  64

Capital or to ask about a call that INGERSOLL purportedly was going to have with Beckworth.

On July 12, 2021, INGERSOLL sent a text message to L.W. that they had a call with B.C. the next day at 3:00 pm. The next day, INGERSOLL sent a text message to L.W. stating that INGERSOLL could not make it, but would come by the next day. After INGERSOLL did not respond to L.W.'s texts, L.W. asked whether a call was scheduled with B.C. on July 14, 2021. INGERSOLL initially did not respond to L.W. and when INGERSOLL finally contacted L.W., INGERSOLL claimed that he got his phone back and that he was at the phone store upgrading his phone.

On July 14, 2021, INGERSOLL sent a text message to L.W. that he was attempting to find a time to talk with Beckworth. The next day, INGERSOLL falsely stated via text message that he was still "waiting to hear back from BECKWORTH." On July 16, 2021, INGERSOLL sent a text message to L.W. falsely stating that INGERSOLL "emailed BECKWORTH to set call for 11am Monday." On July 19, 2021, L.W. sent a text message to INGERSOLL asking again for Beckworth's number, so that L.W. could call himself. INGERSOLL never provided that number, and L.W. never talked with Beckworth.

The alleged refinancing transaction involving B.C. was fraudulent. As noted above, B.C. has not occupied space in 250 Park Ave, New York, NY

Defendant's Initials _____  65

during the past eight years. In addition, the name and title of the B.C. representative changed during different parts of the scheme. Raymond Beckwith, Jr. was represented as being the Senior Partner who signed a contract in February 2019. When it came time for the refinancing, Raymond Beckwith, Jr. became a "Lending Manager." Moreover, when it came time for L.W. to talk with him, Raymond Beckwith, Jr. became Raymond Beckworth, which is the name that was used for the Raymond Beckworth email account.

Google subscriber information shows that INGERSOLL created the Raymond Beckworth email account. The name provided in the subscriber information is INGERSOLL's name. INGERSOLL's cellular telephone number is listed as the recovery number for the account. The Raymond Beckworth email account was created on July 2, 2021, which is the date when it was first used with L.W.   INGERSOLL created and used the fictitious identity of Raymond Beckworth, and the associated email account, to further his fraudulent scheme.

Defendant's Initials _____   66

## I.   L.W's Requests for the Return of the Refundable Deposits

On December 14, 2020, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, advising ADAMCZYK of the possibility of recalling some of the refundable deposit funds by year's end.

In April 2021, L.W. requested that ADAMCZYK return some of his refundable deposits. On April 28, 2021, L.W. sent a text message to INGERSOLL stating:

> TOMORROW I WILL BE SENDING JIM A "DEMAND FOR REFUND" OF SOME DE[OSITS - LYFORD CAY & MAYBE OTHERS. DEMAND WILL BE SUBJECT TO CANCELLATION (E.G. IF REFI CLOSES BY MAY 7). CALL TO DISCUSS

On April 30, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, attaching a demand for ADAMCZYK to return the $6 million refundable deposit for Lyford Cay. L.W. directed ADAMCZYK to wire the funds to a Bank of America account on May 12, 2021. By the middle of April 2021, however, ADAMCZYK's Fifth Third accounts for Daystar Investments, IDrive Orlando Media Group, and Shooters Orlando Inc. were closed and his accounts at JP Morgan Chase for himself (account # 8067), IDrive Media Group Inc. (account # 5025), and Shooters (account #2538) contained less than $100,000.

Defendant's Initials _____   67

On May 3, 2021, ADAMCZYK and L.W. engaged in a text message conversation with each other in which L.W. inquired regarding the refund of his deposits, and ADAMCZYK claimed to be in Costa Rica with bad cell service. Also on May 3, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, re-sending a copy of the April 30, 2021 email and attachment.

On May 5, 2021, ADAMCZYK and L.W. engaged in another text message conversation during which L.W. asked for confirmation that ADAMCZYK had received the refund instruction for the $6 million in deposits for Lyford Cay. ADAMCZYK confirmed receipt of the refund request, but claimed to have poor internet service and to be located outside of the United States.

On May 9, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, attaching a copy of a letter amending his demand for the return of refundable deposits. The total of the amended demand was $7.5 million, consisting of $6 million for Lyford Cay and $1.5 million for a refinancing deal.

On May 9, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, attaching a letter demanding payment of $1,128,000 in refundable deposits for the St. James property, the Nebraska

Defendant's Initials _____ 68

hospital, and several other projects by May 11, 2021. L.W. explained that this was in addition to the $7.5 million deposit refund previously demanded.

On May 10, 2021, L.W. sent a text message to ADAMCZYK stating: "Please call to confirm that you'll be sending both refundable deposit wires tomorrow morning 7.5mm & 1.128mm." ADAMCZYK did not respond to that text or follow-up texts that L.W. subsequently sent to him on May 11, 2021, May 12, 2021, May 17, 2021, May 19, 2021, May 24, 2021, June 1, 2021, June 2, 2021, June 3, 2021, June 16, 2021, June 18, 2021, June 20, 2021, June 23, 2021, and June 28, 2021.

On May 10, 2021, INGERSOLL sent a text message to L.W. that ADAMCZYK had tested positive for COVID-19 and that he was stuck in Costa Rica. INGERSOLL claimed that ADAMCZYK was supposed to be back on Friday to wire L.W.'s funds. L.W. asked INGERSOLL to provide ADAMCZYK's office number, so that L.W. could call someone there. INGERSOLL never sent L.W. that number, claiming that he was in a "bad service area so my phone only works sometimes." INGERSOLL eventually stated that he only had ADAMCZYK's cell phone number and that he had asked other people for ADAMCZYK's office number.

Bank activity for his accounts at JP Morgan Chase is inconsistent with any claim that ADAMCZYK was in Costa Rica on May 10, 2021:

Defendant's Initials _____  69

| Date | Account | Transaction |
|------|---------|-------------|
| 5/10/2021 | Shooters of Orlando, Inc. (account # 2538) | $10.42 at Captain D's in Orlando, Florida |
| 5/11/2021 | Shooters of Orlando, Inc. (account # 2538) | $800 ATM withdrawal in Orlando, Florida |
| 5/11/2021 | Shooters of Orlando, Inc. (account # 2538) | $800 ATM withdrawal in Orlando, Florida |
| 5/11/2021 | Shooters of Orlando, Inc. (account # 2538) | $42.25 and $247.48 at Eddie V's in Tampa, Florida |
| 5/11/2021 | Shooters of Orlando, Inc. (account # 2538) | $5.67 at Magnolia's Cafe in Tampa, Florida |
| 5/11/2021 | Shooters of Orlando, Inc. (account # 2538) | $19.53 at the Hilton Tampa Airport |
| 5/11/2021 | IDrive Media Group Inc. (account # 5025) | $119.97 at the Hilton Tampa |

On May 12, 2021, INGERSOLL sent a text message to L.W. with a copy of a message purportedly from ADAMCZYK, claiming that ADAMCZYK was the only one authorized to wire funds from his account:

> Fwd: Mr. Ingersoll, a member of your group is calling me and I have limited service. I have been positive with the virus and attempting to get out of the country back to the states. I also some point today need to draft a cancellation of contract with B[.] and mutual release of deposits back to your team. I am the only one authorized to wire funds from my account. Thanks.

After sending that text, INGERSOLL claimed in a text message to L.W. that he had "good news," which is that the "Lyford deal looks like it will be

Defendant's Initials _____   70

signed within 14 days from yesterday." On May 12, 2021, INGERSOLL sent a
text message to L.W. stating:

> Jim is gonna send it. He's done millions of deals with me. I'm not worried
> I just don't think he has the process to send it without being there. I'm
> gonna get on his ass now.

On May 14, 2021, INGERSOLL sent a text message to L.W. that falsely
represented that he had a "buyer for Daytona. That will fix all our $$$ issues."

On May 19, 2021, L.W. asked one of his employees to research who
owned the G.P. and F.E. properties in Marion County for which L.W. believed
L.W. had refundable deposits with ADAMCZYK. After being advised that one
property was owned by F.E., but at a Miami address as opposed to an Orlando
address, and that the second property was owned by O.E.F., L.W. emailed
INGERSOLL, "WE WERE DEFRAUDED HERE – WE NEED TO
DISCUSS WHAT / WHEN / HOW TO DO ANTHING???" On May 20,
2021, INGERSOLL sent an email to L.W. stating, "I'll get in it tomorrow and
figure out what we need to do to and how and when I agree."

On May 20, 2021, L.W. sent an email to ADAMCZYK, with a copy to
INGERSOLL, attaching a letter demanding payment of the $800,000
refundable deposit for the Daytona 128 project. On May 20, 2021,
INGERSOLL emailed an extension of the Daytona 128 project. After receiving
that extension, L.W. sent an email to ADAMCZYK, with a copy to

Defendant's Initials _____   71

INGERSOLL, rescinding his request for the return of that deposit. INGERSOLL sent a text message with that request to L.W. on that same day, stating: "I sent you the executed extension for Daytona. Can u please rescind the demand for $$$ deposit."

On May 20, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL, which attached a letter explaining that L.W. had changed the escrow beneficiary due to ADAMCZYK's "COVID related delay in returning from Costa Rica" and his claim that ADAMCZYK's bank "will not wire our Refundable Deposits until you return." The letter was addressed to "Jim Adamczyk, Esq."

On May 21, 2021, INGERSOLL sent a text message to L.W. stating that ADAMCZYK texted him yesterday and "was feeling better an[d] in Costa Rica."

On May 24, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL, asking when ADAMCZYK expected to return to the United States. On May 27, 2021, INGERSOLL sent a text message to L.W. that INGERSOLL was in Tennessee "working on electric company to close Daytona piece." INGERSOLL claimed in a text message to L.W. on June 7, 2021 to be in Tennessee with the "Electric company for Daytona." As noted above, the major energy company was not able to find any records regarding

Defendant's Initials _____   72

any communications with INGERSOLL about any possible purchase of real estate in Volusia County, Florida.

On June 3, 2021, L.W. emailed INGERSOLL, "WE WERE DEFRAUDED HERE – WE NEED TO DISCUSS WHAT / WHEN / HOW TO DO ANTHING???" On June 3, 2021, INGERSOLL, sent an email to L.W. stating, "Give him one more day. This was end of covid which he I guess couldn't physically or legally get back from Costa Rica."

On June 15, 2021, INGERSOLL sent a text message to L.W. that he had received a text from ADAMCZYK stating that ADAMCZYK was taking a boat back to the United States. INGERSOLL's statement is inconsistent with debit card activity for ADAMCZYK's IDrive Media Inc. account at JP Morgan Chase Bank (account #5025), which reflects a $400 ATM withdrawal in Orlando, Florida on June 12, 2021, a $8.64 purchase at Wendy's on June 13, 2021, and a June 17, 2021 purchase of $49.02 at Havana Restaurant in West Palm Beach, Florida.

On June 21, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, attaching a letter demanding, again, payment of the two refund demands that been previously made for $8.5 million and $1.128 million. The letter was addressed to "James Adamczyk, Esq.," and

Defendant's Initials _____   73

L.W. stated, "Sorry about your troubles in Costa Roca regarding COVID-19 and its delaying effect on your return." (sic)

On June 22, 2021, INGERSOLL sent a text message to L.W. that he believed that ADAMCZYK was "in Miami heading to Milwaukee." On July 5, 2021, L.W. sent an email to ADAMCZYK, with a copy to INGERSOLL and another person, attaching another copy of his two demands for the return of his refundable deposits.

On July 5, 2021, L.W. sent a text message to INGERSOLL asking INGERSOLL to make "some effort today with Jim" and raised the possibility of sending a private investigator to find him or reporting theft to the FBI. INGERSOLL responded: "I thought we were leaving Jim alone waiting for Wednesday to see if Blackwood would refi." In response to L.W.'s question about whether to use a private investigator or report the situation to the FBI, INGERSOLL stated: "I don't think it rises to FBI. Need to do civil first because we want the $$." INGERSOLL claimed that the FBI "take forever tho."

INGERSOLL attempted to use the possibility of a refinancing by Blackwood Capital as a reason to delay any action related to ADAMCZYK ("Then all this Jim stuff we can figure out later once we get clear to close with Blackwood"). When L.W. asked for details about ADAMCZYK's age, INGERSOLL attempted to use the (fake) B.C. refinancing to delay any

Defendant's Initials _____   74

decisions about ADAMCZYK ("Let's wait one or two more days especially with B[.] coming back to the table. Then we can strategize.").

On July 16, 2021, INGERSOLL claimed that he had "emailed BECKWORTH to set call for 11am Monday. I'm under the impression he can fund way before 27th deadline." As noted above, the "Raymond Beckworth" who INGERSOLL claimed worked at B[.] C[.] does not exist.

On August 6, 2021, INGERSOLL and L.W. texted about ADAMCZYK. INGERSOLL stated he had talked with ADAMCZYK "two days ago" and that ADAMCZYK was in Costa Rica to go to court for money owed to him. INGERSOLL claimed that ADAMCZYK "was in a will from old partner who left him millions."

### J.  Use of the scheme proceeds

Contrary to the representations that the Suspended Attorney, ADAMCZYK and INGERSOLL made to the L.W. about holding L.W.'s funds in escrow, INGERSOLL, ADAMCZYK, and other co-conspirators used the funds for their own personal benefit. Specifically, the funds were used to compensate co-conspirators for their role in the scheme, for luxury car rentals, travel, and adult entertainment.

Defendant's Initials _____   75

### K.  Loss to L.W.

The total amount of funds that L.W. was fraudulently induced to provide to INGERSOLL and the other conspirators amounted to approximately $12,700,000 which represents the total loss to L.W. in this case. Of the $12,700,000 total loss amount, $9,602,200 was transferred into accounts held by INGERSOLL.

## II.  <u>Conspiracy to Commit Wire Fraud against Government Agency</u>

### A. Overview

Beginning in January 2017 and continuing through November 2017, INGERSOLL and another conspirator (the "Straw Purchaser Conspirator") conspired with other co-conspirators (collectively referred to as "the co-conspirators") to commit wire fraud in the Middle District of Florida. The scheme involved a local government entity in the Middle District of Florida. A government official for that local government entity (the "Public Official") hired INGERSOLL and his company, the Ingersoll Consulting Group LLC to serve as a real estate consultant for the local government entity.

Rather than use that role to benefit the local government entity, INGERSOLL used his position to devise a scheme to defraud the local government entity by finding a straw purchaser to purport to purchase a piece of real estate in the Middle District of Florida (the "Property").  The Straw

Defendant's Initials _____ 76

Purchaser executed an agreement with the seller to purchase the property. In fact, the conspirators used money from the local government agency to purchase the property as opposed to any money from the Straw Purchaser. The co-conspirators concealed the source of the funds through the use of a false HUD-1. On the same day that the Straw Purchaser purportedly purchased the Property from the seller, the conspirators caused the property to be transferred to the local government agency for an extra approximately $262,000 more than it had been purchased for. The $262,000 windfall was then divided amongst INGERSOLL, the Straw Purchaser, and the other conspirators.

B. **The Conspiracy**

In January 2017, an employee of the local government agency located a property in Winter Springs, Florida that was listed for sale and identified this property as a potential location of operation for the government agency. The employee contacted the real estate agent who had listed the property and learned that the property was listed for $770,000, but that the seller would be willing to accept $690,000 for the property. The employee relayed this information to the Public Official on February 22, 2017, via messages on social media and emails.

Over approximately the next month, the Public Official sent emails to government agency employees and to a co-conspirator (Property Co-

Defendant's Initials _____   77

conspirator 1) demonstrating an interest in acquiring the property. During this time, INGERSOLL was acting as a "real estate consultant" for the local government agency and went to view the property with the Public Official and other co-conspirators. On March 16, 2017, after two visits to the property in Winter Springs, FL, the employee for the government agency sent an email to the Public Official describing the property. In this email, the employee described a vault that was to be sold with the property and that was included in the asking price for the property.

In response to the March 16, 2017 email from the government employee, the Public Official sent an email to the employee demonstrating an intent to purchase the property. After March 2017, the Public Official deliberately cut off communication with the employee and allowed INGERSOLL to take the lead on the transaction.  INGERSOLL used his position as a real estate consultant for the local government agency to devise and execute a scheme to enrich himself, INGERSOLL, and other conspirators by paying an inflated price for the Property, some of which would be distributed back to the co-conspirators as kickbacks.

Because of his position as a consultant with the local government agency, INGERSOLL knew that he could not serve as the purchaser of the property without subjecting himself to a high risk of being identified as having a conflict

Defendant's Initials _____   78

of interest. Instead, INGERSOLL recruited the Straw Purchaser. On August 22, 2016, the Straw Purchaser had established a company (the "Company"), which was subsequently used in connection with fraudulent property transaction.[4] The Straw Purchaser was the registered agent and vice president for the Company. There was only one other officer of the Company, an individual who was the President and Vice President (Property Co-conspirator 2). Property Co-conspirator 2 owned the title company that handled the transaction and prepared a false HUD-1 for the transaction.

The Straw Purchaser willfully served as the straw purchaser for the fraud scheme. The Straw Purchaser did not use any of his own money for the transaction and was compensated with a $50,000 kickback at the conclusion of the transaction. The Straw Purchaser's role was to make it appear that the sale of the property to the local government agency was being conducted at arm's length even though it was not, and to hide from public scrutiny the fact that INGERSOLL provided the money for the down payment for the straw purchase of the Winter Springs property. Property Co-conspirator 2 negotiated the purchase price with the seller of the property via a series of emails. During the negotiations, the seller of the property agreed to sell the property for

---

[4] The Company only existed for about a year. It was administratively dissolved in September 2017.

$680,000 to the Straw Purchaser and his Company. The price included a down payment of $25,000 with $655,000 due at closing.

On March 29, 2017, the Straw Purchaser sent a letter of intent to the seller of the Property via email. According to the negotiated terms, the letter indicated that the Company would purchase the property for $680,000 and would made an initial deposit of $25,000 at contract execution.

On April 7, 2017, the Straw Purchaser executed a purchase contract with the seller, which was a bank. In that contract, the Straw Purchaser agreed to purchase the real property and all of the fixtures for the property (except for seller's signage, ATMs, and proprietary systems and equipment). The purchase contract confirmed that the vault would be included in the purchase price.

The Straw Purchaser did not fund the $25,000 down payment that was made along with the execution of the purchase contract; rather he used money given to him by INGERSOLL for the down payment. As of April 11, 2017, the Company had approximately $10,081.80 in its Seacoast Bank account (account 9626). On April 11, 2017, INGERSOLL wrote a check to the Company in the amount of $25,200. On that same date, the Straw Purchaser deposited the check into the Company's account 9626. On April 11, 2017, the Straw Purchaser wire transferred $25,000 from that account to the bank account ending in 8710 of Property Co-conspirator 2, who was the title insurer handling the closing.

Defendant's Initials _____   80

On April 14, 2017, the Straw Purchaser executed a "Commercial Contract" on behalf of the Company with the local government agency to sell the local government agency the Property. The contract provided that the local government agency would purchase the Property for $942,000, *i.e.* $262,000 more than the purchase price that the Company was going to pay the bank. The contract, which was prepared by Property Co-conspirator 2, divided the purchase price into two components: $810,000 for the real property and $132,000 for the "[b]ank vaults and all furniture and fixtures." The listed closing date for the transaction was May 1, 2017.

On April 18, 2017, the Public Official executed the contract on behalf of the government agency to purchase the property. On April 24, 2017, the Straw Purchaser emailed a copy of the contract to Property Co-conspirator 1. The closings occurred on May 10, 2017. To assist in the transfers of funds, INGERSOLL enlisted another friend of his, who is a local attorney. On May 10, 2017, the government agency wire transferred $938,217.88 to the attorney's account at Seacoast Bank (#9226). That same day, the attorney wire transferred $938,947.41 to the title insurer's bank account. On May 11, 2017, Property Co-conspirator 2, through his title company, wired $615,855.55 to the seller of the bank, thereby satisfying the amount for the Straw Purchaser and the Company

Defendant's Initials _____ 81

on the original property deal and also paid the Seller's realtor the amount that it was owed, $13,600, which reflected 2% of the purchase price.

Between May 12, 2017, and the end of June 2017, kickbacks were paid out to the co-conspirators. Specifically, on May 12, 2017, Property Co-conspirator 2, through the title company, wired $50,000 to the Straw Purchaser and his Company and $220,093.36 to INGERSOLL's attorney associate. That same day, this attorney wired $212,793.36 to INGERSOLL through Ingersoll Financial. On May 16, 2017, INGERSOLL through Ingersoll Financial wired $20,500 back to the attorney, who then wired $20,000 to Property Co-conspirator 1. The Public Official then received approximately $6,000 from Property Co-conspirator 1, approximately $2,000 from the Straw Purchaser, and approximately $8,000 from INGERSOLL in connection with this fraud. Later, INGERSOLL paid the Public Official additional kickbacks.

Two HUD-1s were prepared for the transaction, one for the Property's sale to the Company and one for the Company's sale to the local government agency. The HUD-1 for the Property's sale to the Company falsely represented that the funds for the transaction were being paid by the Company. In fact, the sole funds that were deposited into the title insurer's bank account were the local government agency's funds. The Company never paid any of the $654,723.55 that was identified on the HUD-1 as being due as "Cash from Borrower." The

Defendant's Initials _____  82

HUD-1 for the Company sale to the government agency concealed that INGERSOLL was ending up with over $200,000 of the proceeds and that the Company and the Property Co-conspirator 1 were paid kickbacks of $50,000 and $20,000, respectively.

Thereafter, in May and June 2017, INGERSOLL chartered a private jet traveled to a casino within the Middle District of Florida with the Public Official on three separate occasions. During these trips INGERSOLL paid the Public Official more than $1,000 in casino chips as a kickback from the Property transaction.

Later, two employees of the government agency attempted to obtain documentation for the purchase of the Winter Springs property. On July 27, 2017, an employee sent an email to Property Co-conspirator 1 asking for documentation of the Winter Springs property purchase. To avoid providing documentation of this fraudulent property deal, Property Co-conspirator 1 replied to this email stating, "For? It is all paid." Later, on August 3, 2017, another employee of the government agency forwarded an email to Property Co-conspirator 1 asking for a copy of an appraisal, inspection report, or other documentation outlining the details of the property, building, and building construction. Property Co-conspirator 1 never sent the requested documents.

Defendant's Initials _____   83

After local media wrote about the Property transaction, INGERSOLL provided additional cash to the Public Official as a further kickback to the Property transaction.

The wire transfers of funds were processed on servers located outside of the State of Florida.

### III.   Attempted Wire Fraud against Small Business Administration

In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act. In conjunction with an officially declared disaster by the United States Government, the CARES Act allowed for the Small Business Administration (SBA), an agency of the United States, to offer Economic Injury Disaster Loan (EIDL) funding to business owners negatively affected by the COVID-19 pandemic.

Using the SBA online portal, EIDL applicants submitted personal and business information in support of each EIDL application, and they did not have to submit supporting documentation of any sort. The application required the applicant to affirm that the information submitted was true and correct under the penalty of perjury and applicable criminal statutes.

The application process involved filling out assorted data fields relating to the size of the affected business entity, the ownership of said business, and

Defendant's Initials _____ 84

other information such as the number of employees and gross business revenues realized in the 12 months prior to the date of the disaster (January 31, 2020). This information furnished by the applicant was then used by SBA application evaluation systems to calculate the principal amount of money the small business was eligible to receive in the form of an EIDL.

Pursuant to the provisions governing the EIDL program, loan proceeds had to be used by that business on certain permissible expenses. The EIDL (working capital) loans had to be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

On March 31, 2020, INGERSOLL submitted an application to the SBA for an EIDL loan on behalf of the Ingersoll Group, which if granted would have resulted in a distribution to INGERSOLL in the amount of approximately $66,500. On this application, INGERSOLL falsely represented the Gross Revenues and the Cost of Goods sold for "The Ingersoll Group" in 2019 to fraudulently increase the amount of the loan for which his business could qualify. The application was sent from the Middle District of Florida and processed on servers located in West Des Moines, Iowa. The application was ultimately denied by the SBA.

Defendant's Initials _____ 85

Specifically, on this application INGERSOLL listed the gross revenue of the Ingersoll Group for the preceding 12 months as being $1,350,000 and the cost of goods sold for that same period as being $1,122,500. These amounts were false. The Ingersoll Group did little to no legitimate business during this time period. The amount of revenue listed by the business was false. Most of the "revenue" that could be claimed by the business was in fact fraud proceeds from the fraud perpetrated against L.W. The cost of goods listed by INGERSOLL was also false. As stated, the Ingersoll Group did little to no legitimate business. In 2019, the Ingersoll Group did not provide any legitimate services or sell any goods beyond hosting a small number of social or fundraising events that were typically attended by INGERSOLL's own friends and acquaintances.

Defendant's Initials _____   86